# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CAROLINE BRODIE, ANGELA HUNTER, and ACCESS NOW, INC., individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>SPEEDWAY LLC,<br><br>        Defendant. | Case No. 2:17-cv-00133-RCM |

## PLAINTIFFS' BRIEF IN OPPOSITION
## TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Edwin J. Kilpela
ekilpela@carlsonlynch.com
Benjamin J. Sweet
bsweet@carlsonlynch.com
**CARLSON LYNCH SWEET**
**KILPELA & CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
(p)   (412) 322-9243
(f)   (412) 231-0246

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

PROCEDURAL HISTORY .................................................................................. 2

CONCISE STATEMENT OF MATERIAL FACTS ............................................ 4

LEGAL STANDARD ........................................................................................... 4

ARGUMENT ........................................................................................................ 5

    I.     SECTION 211 REQUIRES THAT ADA ACCESSIBILITY IS
          MAINTAINED OVER TIME AND DEFENDANT UNDERSTANDS AND
          IGNORES THAT OBLIGATION ................................................................. 5

          A.    Section 211 and DOJ guidance establish that public accommodations
               are under an ongoing duty maintain *all* accessible features. ............... 6

          B.    The legislative history of the ADA reflects Congress intended to place
               the burden to identify discriminatory conditions on public
               accommodations. ..................................................................................... 11

          C.    Defendant understands its obligations under Section 211 but fails to
               comply. ..................................................................................................... 15

    II.    THE ADA PROVIDES AN EXPRESS PRIVATE RIGHT OF ACTION TO
          ENFORCE SECTION 211. ........................................................................... 18

    III.    SECTION 211 IS NOT UNCONSTITUTIONALLY VAGUE. ...................... 21

CONCLUSION ................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alexander v. Sandoval*,
  532 U.S. 275 (2001)............................................................................................... 19

*Am. Trucking Ass'ns Inc. v. Delaware River Joint Toll Bridge Comm'n*,
  458 F. 3d 291 (3d. Cir. 2006)............................................................................. 20

*Auer v. Robbins*,
  519 U.S. 452 (1997).............................................................................................. 10

*Botosan v. Paul McNally Realty*,
  216 F.3d 827 (9th Cir. 2000) ............................................................................. 21

*Bral Corp. v. Johnstown Am. Corp.*,
  919 F. Supp. 2d 599 (W.D. Pa. 2013)................................................................. 4

*Brooke v. A-Ventures, LLC*,
  No. 2:17-cv-2868, 2017 WL 5624941 (D. Ariz. Nov. 22, 2017) ..................... 21

*Canal Barge Co. v. Commonwealth Edison Co.*,
  No. 98-cv-0509, 2002 WL 1264002 (N.D. Ill. June 3, 2002)............................. 7

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................................ 4

*Coates v. City of Cincinnati*,
  402 U.S. 611 (1971).............................................................................................. 22

*Dudley v. Hannaford Bros. Co.*,
  333 F.3d 299 (1st Cir. 2003)................................................................................ 19

*F.C.C. v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012).............................................................................................. 24

*Fortyune v. Am. Multi-Cinema, Inc.*,
  No. 10-cv-5551, 2002 WL 32985838 (C.D. Cal. Oct. 22, 2002) ...................... 9

*GNC Fran., Inc. v. O'Brien*,
  05-cv-0270, 2007 WL 2119242 (W.D. Pa. July 20, 2007)................................... 4

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972).............................................................................................. 22

*Helen L. v. DiDario*,
  46 F.3d 325 (3d Cir. 1995).................................................................................. 13

*Loeffler v. Staten Island Univ. Hosp.*,
  582 F.3d 268 (2d Cir. 2009)................................................................................ 21

*Lozano v. C.A. Martinez Fam. Ltd.*,
  *Partn.*, 129 F. Supp. 3d 967 (S.D. Cal. 2015)................................................... 9

*Mielo v. Steak 'n Shake Operations*,
  897 F.3d 467 (3d Cir. 2018)................................................................... 3, 5, 11, 13

*Mitchell v. City of Pittsburgh*,
  995 F. Supp. 2d 420 (W.D. Pa. 2014) ....................................................................... 4
*Nanni v. Aberdeen Marketplace, Inc.*,
  878 F.3d 447 (4th Cir. 2017) ................................................................................. 19
*Newman v. Piggie Park Enters., Inc.*,
  309 U.S. 400 (1968) .............................................................................................. 19
*Parker v. Levy*,
  417 U.S. 733 (1974) .............................................................................................. 21
*Pollard v. TMI Hosp. GP, LLC*,
  No. 16-11281, 2017 WL 1077682 (E.D. Mich. Mar. 22, 2017) ............................... 9
*Ross v. City of Chicago*,
  168 Ill. App. 3d 83, 522 N.E.2d 215 (1988) ............................................................ 6
*Santiago Ortiz v. Caparra Ctr. Associates, LLC*,
  261 F. Supp. 3d 240 (D.P.R. 2016) ....................................................................... 21
*Shariff v. Radamar Meat Corp.*,
  No. 11-cv-6369, 2014 WL 1311563 (E.D.N.Y. Feb. 14, 2014) ............................. 20
*Spencer Bank, S.L.A. v. Seidman*,
  309 F. App'x 546 (3d. Cir. 2008) .......................................................................... 19
*Three Rivers Ctr. For Indep. Living v. Hous. Auth. Of the City of Pittsburgh*
  382 F.3d 412 (3d. Cir. 2004) ................................................................................. 20
*U.S. v. AMC Ent., Inc.*,
  549 F.3d 760 (9th Cir. 2008) ................................................................................. 21
*U.S. v. Mead Corp.*,
  533 U.S. 218 (2001) .............................................................................................. 10
*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
  455 U.S. 489 (1982) .............................................................................................. 21
*Wisniewski v. Rodale, Inc.*,
  510 F.3d 294 (3d. Cir. 2007) ................................................................................. 19

**Statutes**

42 U.S.C. § 2000a ............................................................................................................ 18
42 U.S.C. § 2000a-3(b) ................................................................................................... 20
42 U.S.C. § 12181(9) ................................................................................................ 14, 15
42 U.S.C. § 12182(a) ...................................................................................................... 21
42 U.S.C. § 12182(b)(1) ................................................................................................. 14
42 U.S.C. § 12183(a)(1) .................................................................................................... 3
42 U.S.C. §§ 12186(b) .................................................................................................... 10
42 U.S.C. § 12188 ..................................................................................................... 18, 19
42 U.S.C. § 12188(a)(2) .................................................................................................. 15
42 U.S.C. § 12188(b)(1) .................................................................................................. 10

42 U.S.C. § 12205 ................................................................................................ 19

**Rules**

Fed. R. Civ. P. 56(c) ........................................................................................... 4

**Regulations**

28 C.F.R. § 36.101(b) ........................................................................................ 12
28 C.F.R. § 36.104 ........................................................................................ 8, 14
28 C.F.R. § 36.204 ............................................................................................ 13
28 C.F.R. § 36.211 ..................................................................................... passim
28 C.F.R. § 36.211(a) ..................................................................................... 7, 13
28 C.F.R. § 36.211(b) ......................................................................................... 7
28 C.F.R. § 36.302 ...................................................................................... 15, 22
28 C.F.R. § 36.302(e)(1)(i) ............................................................................... 22
28 C.F.R. § 36.303(a) ........................................................................................ 14
28 C.F.R. § 36.303(c) ........................................................................................ 22
28 C.F.R. § 36.303(g)........................................................................................14
28 C.F.R. § 36.304 ......................................................................................12, 15
28 C.F.R. §§ 36.304(b)……………………………………………………………………….21
28 C.F.R. §§ 36.305…………………………………………………………………………12
28 C.F.R. §§ 36.401……………………………………………………………………………12
28 C.F.R. §§ 36.402………………………………………………………………………........12
28 C.F.R. §§ 36.403………………………………………………………………………...12
28 C.F.R. §§ 36.402(b)…………………………………………………………………………….21
28 C.F.R. § 36.501…………………………………………………………………….....18, 22
28 C.F.R. § 36.501(b)........................................................................................15
28 C.F.R. § Pt. 36, subpt. D...............................................................................9
28 C.F.R. § Pt. 36 1191......................................................................................9
28 C.F.R. § Pt. 36, app. A..................................................................................22
28 C.F.R. § Pt. 36, App. C................................................................................8,10, 23
28 C.F.R. § Pt. 36, App. D.................................................................................8, 9
Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial
    Facilities, 73 Fed. Reg. 34508-01, 34523 (June 17, 2008).....................................7, 10, 11, 24

**Other Authorities**

The American Heritage Dictionary of the English Language........................................7
Black's Law Dictionary (5th ed. 1971)...............................................................7
Black's Law Dictionary (10th ed. 2014) ..............................................................6
H.R. REP. 101-485 .............................................................................. passim
U.S. Department of Justice, 2010 ADA Standards for Accessible Design
    (September 15, 2010).......................................................................22, 23

U.S. Department of Justice, ADA Guide for Small Towns, Civil Rights Division, Disability Rights Section (April 2000)...............................................................................................8

U.S. Department of Justice, ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities.................................................................23, 24

U.S. Department of Justice, Maintaining Accessible Features in Retail Establishments (July 6, 2009).................................................................................................................8

## **INTRODUCTION**

Defendant is well aware that the Americans with Disabilities Act ("ADA") applies to its businesses and that it has an ongoing obligation to maintain its facilities in compliance with the ADA. In its Motion for Partial Summary Judgment ("Motion"), Defendant asks this Court to ignore the plain language of the ADA, repeated and unequivocal statements by the Department of Justice ("DOJ"), and the legislative history of the ADA, and hold, as a matter of law, that the ADA's broad and comprehensive mandate to maintain facilities in compliance with ADA regulations is inapplicable to Defendant's parking facilities. In effect, Defendant asks this Court to create an exception to the ADA where none exists. At its core, Defendant's Motion is asking the Court to effectively rewrite the ADA through judicial fiat and, for that reason alone, it should be denied.

In addition to ignoring, misstating, or misapplying the applicable laws and regulations, Defendant's Motion also utterly mischaracterizes the nature of this lawsuit and the relief sought. Defendant urges this Court to believe that Plaintiffs seek to impose upon it a new, undefined, and highly expensive policy. Nothing could be further from the truth. The record evidence in this case—virtually all of which was obtained through Defendant's corporate designee—demonstrates that Defendant has a comprehensive maintenance policy in place that, in certain areas, attempts to discharge Defendant's maintenance obligation under the ADA. But, this same policy selectively ignores certain aspects of the ADA.  Neither Defendant, nor any place of public accommodation, is free to pick and choose among the ADA's requirements at its leisure and convenience. In this lawsuit, Plaintiffs seek, as provided by the ADA, a modification of Defendant's *existing* policy in order to remedy its discriminatory impact.  Such actions are expressly contemplated by the ADA and this Court should allow this matter to proceed.

1

As more fully explained herein, the Court should reject Defendant's motion in its entirety because the plain language of the ADA and its implementing regulations, as well as DOJ guidance, establish an ongoing duty on public accommodations to maintain all accessible features. Furthermore, this Court should deny Defendant's attempt to foist its maintenance duties on people with disabilities because the legislative history of the ADA reflects a manifest Congressional intention to place the burden to identify and remediate discriminatory conditions on places of public accommodation. Third, the ADA and its implementing regulations unambiguously provide individuals with a private right of action to enforce the ADA.  And, finally, this Court should reject Defendant's absurd argument that the the regulation at issue in this matter is unconstitutionally vague.

## PROCEDURAL HISTORY

Plaintiffs initiated this action on January 27, 2017 following visits to Defendant's convenience stores where they experienced unnecessary difficulty and risk due to excessive slopes within Defendant's parking facilities. ¶¶ 29, 30.[1] Plaintiffs Caroline Brodie and Angela Hunter both have mobility disabilities and are limited in the major life activity of walking, causing them to use a wheelchair for mobility. ¶¶ 22, 23. On Plaintiffs' behalf, investigators examined the Defendant's properties visited by Plaintiffs and at least fifteen other properties located across Pennsylvania, Ohio, and New Jersey. ¶ 33. These investigations revealed widespread ADA violations in the parking facilities of Defendant's properties, symptomatic of substandard ADA compliance practices. ¶ 41.

Plaintiffs assert "Defendant's centralized design, construction, alteration, maintenance and operational policies and practices have systematically and routinely violated the ADA by

---

[1] "¶_" references are to allegations of Plaintiffs' Complaint, Dkt. No. 1.

2

designing, constructing and altering facilities so that they are not readily accessible and usable, by failing to remove architectural barriers, and by failing to maintain and operate facilities so that the accessible features of Defendant's facilities are maintained[,]" in violation of 42 U.S.C. § 12183(a)(1) and the appropriate regulations. ¶ 40. Plaintiffs assert these violations have and will deter them and similarly situated individuals from returning to Defendant's facilities and that, without injunctive relief, they will be unable to fully access Defendant's facilities in violation of their rights under the ADA. ¶¶ 55-68.

In this class action, Plaintiffs seek a declaratory judgment that Defendant is in violation of the specific requirements of Title III of the ADA and its implementing regulations, as well as a permanent injunction directing Defendant to take all steps necessary to remove the architectural barriers and bring its facilities into ADA compliance and to modify its corporate policies and practices to prevent the reoccurrence of discriminatory conditions. ¶¶ 9, 49-54. Furthermore, Plaintiff seek the ability to monitor Defendant's compliance as well as any other relief the Court deems just, equitable, and appropriate. *Id.*

The parties have engaged in substantial motions practice, fact discovery, including the depositions of the named Plaintiffs, Plaintiffs' investigators, and Defendant's corporate representatives, and unsuccessful mediation and resolution discussions. Following the Third Circuit's decision in *Mielo v. Steak 'n Shake Operations*, 897 F.3d 467 (3d Cir. 2018), Defendant filed the instant Motion for Partial Summary Judgment on November 2, 2018 (Dkt. No. 44).

## CONCISE STATEMENT OF MATERIAL FACTS

Plaintiffs' separately filed Response to Defendant's Statement of Material Facts includes Plaintiffs' Concise Statement of Other Material Facts for the Court's consideration in deciding Defendant's Motion.[2]

## LEGAL STANDARD

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A fact is 'material' if proof of its existence or non-existence might affect the outcome of the suit under applicable law." *GNC Fran., Inc. v. O'Brien*, 05-cv-0270, 2007 WL 2119242, at *3 (W.D. Pa. July 20, 2007) (internal citations omitted).

"In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party." *Mitchell v. City of Pittsburgh*, 995 F. Supp. 2d 420, 429 (W.D. Pa. 2014). "The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact." *Bral Corp. v. Johnstown Am. Corp.*, 919 F. Supp. 2d 599, 606 (W.D. Pa. 2013). Only after the moving party meets this burden must the opposing party "set forth specific facts showing that there is a genuine issue for trial." *Id.*

---

[2] All citations to the evidentiary record are hereinafter designated as "CSMF ¶ __".

## ARGUMENT

Relying exclusively on the Third Circuit's dicta in *Mielo*, Defendant's Motion incorrectly frames Plaintiffs' request for relief as one that would require a public accommodation to adopt completely new, onerous policies that would require Defendant to "constantly inspect its facilities for future, hypothetical [ADA] violations. Def. Br. at 5.[3] That is patently incorrect and Plaintiffs seek no such thing.   Instead, Plaintiffs seek to modify Defendant's existing, system-wide maintenance policy that improperly ignores certain obligations under the ADA in favor of others.

Promulgated by the DOJ, Section 211 is comprehensive in its mandate. It requires—for good reason—places of public accommodation to ensure that its facilities remain accessible after construction. That duty is ongoing and without exception. While a business may choose to discharge that obligation in any number of ways, the chosen method must be effective.   As is demonstrated below, Defendant seeks to ignore the plain language of the ADA because it has chosen a method of compliance that is demonstrably inadequate. Because the law is clear and the facts of this case demonstrate that Defendant's conduct falls well short of the ADA's requirements, Defendant's Motion should be denied.

I.      **SECTION 211 REQUIRES THAT ADA ACCESSIBILITY IS MAINTAINED OVER TIME AND DEFENDANT UNDERSTANDS AND IGNORES THAT OBLIGATION**

Section 211 requires public accommodations to maintain accessibility over time, subject to established readily achievable standards that account for burden and cost. This interpretation is

---

[3] Although the Third Circuit ostensibly expressed restraint ("we must refrain from engaging in a freewheeling merits analysis") in commenting on 28 C.F.R. § 36.211 ("Section 211"), the court nevertheless reduced the plaintiffs' theory of harm with respect to Section 211 to a theory that the plaintiffs' in that matter also never advanced.   Indeed, a review of the plaintiffs' pleadings and amici briefings in *Mielo* presented to the Third Circuit demonstrate that the plaintiffs never argued that Section 211 requires public accommodations "to adopt policies for ADA compliance that require [defendant] to actively seek out potential violations", as characterized by the Third Circuit. *Mielo*, 897 F.3d at 476. The same is true in this matter.

entirely consistent with a plain reading of Section 211's text, and is supported by DOJ interpretations and the legislative intent of the ADA. As will be explained below, Defendant understands it has an obligation to ensure its facilities are maintained but has willfully ignored maintaining the accessibility of specific access features within parking facilities.

A.   **Section 211 and DOJ guidance establish that public accommodations are under an ongoing duty to maintain *all* accessible features.**

The text of Section 211 is plain and unambiguous in establishing a directive to maintain accessibility:

> A public accommodation **shall  maintain** in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part.  (emphasis added).

The controlling and operative terms of this provision that are at issue are: (1) "maintain"; (2) "operable working condition"; (3) "features"; and (4) "facilities".[4]

Defendant fails to address the meaning of the term "maintain" and there is no provided statutory definition within the ADA. Black's Law Dictionary, however, defines the verb "maintain", in relevant part, as follows: "[t]o continue (something)" and "[t]o care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." MAINTAIN, Black's Law Dictionary (10th ed. 2014). Numerous courts have also considered the definition of "maintain" in contexts that parallel Section 211, describing "maintain" as "variously defined as acts of repairs and other acts to prevent a decline, lapse, or cessation from existing state or condition… [to] keep in repair; keep up; preserve." *Ross v. City of Chicago*, 168 Ill. App. 3d

---

[4] The phrase "required to be readily accessible to and usable by" is also relevant to an extent. The legislative history of the ADA describes this phrase as "focus[ing] on the person with a disability and address[ing] the degree of ease with which an individual with a disability can enter and use a facility; it is access and usability which must be 'ready.'" H.R. REP. 101-485, 109-10.

83, 87, 522 N.E.2d 215, 218 (1988) *citing* Black's Law Dictionary 859 (5th ed. 1971); *see also*

*Canal Barge Co. v. Commonwealth Edison Co.*, No. 98-cv-0509, 2002 WL 1264002, at \*4 (N.D.

Ill. June 3, 2002) ("*The American Heritage Dictionary of the English Language* defines 'maintain'

as '[t]o keep in a condition of good repair or efficiency.'").

     Unable to avoid the straightforward meaning of "maintain," Defendant argues that the term

"features" is "vague" and that "it makes no sense to speak about maintaining parking lot slope 'in

operable working condition'". Def. Br. at 6. Defendant's argument that Section 211 is limited only

to mechanical equipment is wholly and unambiguously contradicted by DOJ guidance:

> The Department has noticed that some covered entities do not understand what is
> required by § 36.211, and it would like to take the opportunity presented by this
> NPRM to clarify. **Section 36.211(a) broadly covers <u>all features</u> that are required
> to be accessible under the ADA**, from accessible routes and elevators to roll-in
> showers and signage. It is not sufficient for a building or other feature to be built in
> compliance with the ADA, only to be blocked or changed later so that it is
> inaccessible. A common problem observed by the Department is that covered
> facilities do not maintain accessible routes. For example, the accessible routes in
> offices or stores are commonly obstructed by boxes, potted plants, display racks, or
> other items so that the routes are inaccessible to people who use wheelchairs. Under
> the ADA, the accessible route must be maintained and, therefore, these items are
> required to be removed. If the items are placed there temporarily—for example, if
> an office receives multiple boxes of supplies and is moving them from the hall to
> the storage room—then § 36.211(b) excuses such "isolated or temporary
> interruptions." Other common examples of features that must be maintained, and
> often are not, are platform lifts and elevators. Public accommodations must ensure
> that these features are operable and, to meet this requirement, regular servicing and
> making repairs quickly will be necessary.

Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial

Facilities, 73 Fed. Reg. 34508-01, 34523 (June 17, 2008) (emphasis added). Thus, there is no

question that Section 211 was intentionally drafted to cover <u>all</u> accessible features under the ADA.

Indeed, the DOJ expressly rejected requests—identical to those Defendant now makes in its

Motion—to specifically enumerate the features that are covered by Section 211 by explaining that

Section 211 "properly establishes **the general requirement** for maintaining access and that

further, more detailed requirements are not necessary." 28 C.F.R. § Pt. 36, App. C, § 36.211 (emphasis added). This Court should not put limits or constraints on a duty the DOJ intended to be comprehensive and all-encompassing.

Moreover, the DOJ has made clear that, contrary to Defendant's position, "accessible routes" and similar features <u>can</u> be maintained in "operable working condition". In fact, the DOJ's technical assistance materials use the term "operable working condition" when describing a public entity's obligation to maintain the accessibility of an array of non-mechanical features - including curb ramps, parking spaces, and ramps. *See* U.S. DOJ, ADA Guide for Small Towns, Civil Rights Division, Disability Rights Section (April 2000).[5, 6] The broad applicability of the maintenance obligation to non-mechanical features is further reflected in the very DOJ technical assistance materials cited by Defendant, "Maintaining Accessible Features in Retail Establishments".[7] *See* Def. Br. at 7. In that publication, the non-exhaustive "maintenance list" for accessible parking includes an obligation to "[m]aintain curb ramps and sidewalks to prevent large cracks and <u>uneven surfaces</u> from forming." *Id.* (emphasis added). A sloped surface is most certainly an "uneven surface", and this non-mechanical condition is expressly addressed in the DOJ's guidance regarding the maintenance of places of public accommodation.[8]

---

[5] Available at https://www.ada.gov/smtown.htm#anchor19789.

[6] Section 211's use of the term "facility" lends further support. 28 C.F.R. § 36.104 defines "Facility" to mean "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located." Thus Section 211's use of "those features of facilities" and the DOJ's guidance related to "all features [of a facility] that are required to be accessible" would necessarily encompass parking lots. *See also* H.R. REP. 101-485, 113-14 (commenting on accessible route elements and noting parking access aisles are an encompassed element).

[7] Available at https://www.ada.gov/business/retail_access.htm.

[8] Defendant's position that the DOJ intended to exempt certain features from the maintenance requirement (Def. Br. 7, 10-11) because technical guidance documents did not specifically enumerate every access feature listed within the DOJ's voluminous Standards (28 C.F.R. § pt. 36,

Consistent with the DOJ's position, courts have routinely recognized that Section 211 applies to non-mechanical features such as parking space markings, *Lozano v. C.A. Martinez Fam. Ltd. Partn.*, 129 F. Supp. 3d 967 (S.D. Cal. 2015), and the stable, firm and slip resistant floor and ground surfaces of an accessible roll-in shower, *Pollard v. TMI Hosp. GP, LLC*, No. 16-11281, 2017 WL 1077682 (E.D. Mich. Mar. 22, 2017). Additionally, the DOJ has itself recognized that the maintenance obligation of Section 211 applies to non-mechanical features in consent decrees it has reached and, indeed, has expressly incorporated the language of Section 211 while doing so. *See, e.g.*, *U.S. v. Ybarra et al.*, No. 13-cv-433, Dkt. No. 4 (S.D. Al. Sept. 17, 2013) (Consent decree requiring that "[p]roper maximum cross slopes and parallel slopes <u>shall be maintained</u> in all accessible parking spaces, aisles, ramps and walkways.") (emphasis added).[9]

While Section 211 does not affirmatively require the adoption of self-evaluation policies, it does require a public accommodation to do something to maintain its facilities. In fact, the DOJ's regulatory guidance on Title III expressly contemplates that requirement:

> Although the obligation to engage in readily achievable barrier removal **is clearly a continuing duty**, the Department has declined to establish any independent requirement for an annual assessment or self-evaluation. It is best left to the public accommodations subject to § 36.304 to establish policies to assess compliance that are appropriate to the particular circumstances faced by the wide range of public accommodations covered by the ADA. However, **even in the absence of an explicit regulatory requirement for periodic self-evaluations, the Department still urges public accommodations to establish procedures for an ongoing**

---

app. D; 28 C.F.R. § pt. 36, subpt. D; and 36 C.F.R. § pt. 1191) is woefully misguided. *See, e.g., Fortyune v. Am. Multi-Cinema, Inc.*, No. 10-cv-5551, 2002 WL 32985838, at *12 (C.D. Cal. Oct. 22, 2002) ("The court is unconvinced that the existence of commentary regarding [one ADA requirement], and the lack of commentary as to [a different ADA requirement], requires an inference that the latter is not required."). If the DOJ wanted to exempt slopes from the maintenance requirement, it knew how to do so, just as it exempted newly constructed and altered public accommodations that are less than three stories or less than 3,000 square feet per story from the requirement to install an elevator. *See* DOJ Standards § 206.2.3. It did not, and this Court should refuse Defendant's request to do so now.

[9] Available at:
https://www.justice.gov/sites/default/files/usao-sdal/pages/attachments/2015/04/23/cottonscd.pdf

**assessment of their compliance with the ADA's barrier removal requirements**.

28 C.F.R. § Pt. 36, App. C, § 36.304 (emphasis added).

There is no supporting DOJ interpretation of Section 211 or any ADA implementing regulation that suggests, as Defendant argues, that public accommodations are permitted to passively allow accessibility to lapse over time. While the DOJ does not require public accommodations to implement specific self-evaluation policies, public accommodations are still required to ensure facilities are accessible and that such accessibility is maintained over time. And although the DOJ has afforded public accommodations discretion in <u>how</u> to accomplish those requirements, such discretion does not include a right to indefinitely ignore discriminatory conditions or to wait until they deter or deny access to someone with a disability. Indeed, the DOJ has specifically advised that "allowing obstructions… to persist beyond a reasonable period of time would violate" Section 211. 28 C.F.R. § Pt. 36, App. C, § 36.211. This is consistent with the DOJ's explanation that Section 211 was intended to ensure a facility's accessibility persists over time: "It is not sufficient for a building or other feature to be built in compliance with the ADA, only to be blocked or changed later so that it is inaccessible." 73 Fed. Reg. 34508-01, 34523.

Congress delegated authority to the DOJ to issue regulations under the ADA, to explain the responsibilities of those concerned under the regulations, and to enforce those regulations. *See* 42 U.S.C. §§ 12186(b), 12188(b)(1). An agency's interpretations of its regulations are entitled to deference "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *U.S. v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). Here, the DOJ's interpretations should be afforded deference and should be upheld unless they are "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997).

10

The DOJ has unambiguously established that Section 211 "broadly covers all features that are required to be accessible under the ADA". 73 Fed. Reg. 34508-01, 34523 (emphasis added). The DOJ has repeatedly emphasized that a public accommodation is under an ongoing duty to remove accessibility barriers and that any lapse of accessibility "beyond a reasonable period of time" would violate Section 211, thus emphasizing the ongoing nature of Section 211's mandate. And finally, while the DOJ has afforded public accommodations discretion in determining how to maintain accessibility, there is no DOJ guidance or interpretation supporting that such discretion includes a right to ignore, intentionally or not, discriminatory conditions. The unambiguous intent of Section 211 is to ensure that public accommodations have an ongoing duty to maintain all accessible features of a facility over time. Because the DOJ's interpretations and guidance wholly support this view, and because the DOJ's interpretations are not "plainly erroneous or inconsistent with [Section 211]", this Court should afford due deference. Indeed, Section 211 broadly applies as an ongoing duty to maintain all accessible features and is entirely reasonable and consistent with a plain reading of the regulatory text as well as the DOJ's myriad interpretations and guidance.

**B.      Congress intended to place the burden to identify discriminatory conditions on public accommodations.**

Ignoring the legislative history of the ADA (Def. Br. at 8-10), Defendant cites to dicta from the Third Circuit's *Mielo* opinion to argue that financial considerations permit public accommodations to ignore discriminatory conditions until an individual provides notice. *See* Def. Br. at 8-9; *Mielo*, 897 F.3d at 477 n.10 (commenting on the "the nature and cost" as well as "the overall financial resources of the facility" to be considered when evaluating ADA violations).[10]

---

[10] While Defendant raises the issue of financial burden, it is entirely inappropriate for consideration at this stage of the litigation given that no discovery has been undertaken with respect to Defendant's financial condition.

To the contrary, Congress' manifest intent in enacting the ADA was to require public accommodations to make their facilities accessible and to ensure those facilities stay accessible in order to <u>relieve</u> individuals with disabilities of the burdens of discrimination.

The ADA was intended to broadly provide equal access to people with disabilities by imposing affirmative duties on public accommodations to remove barriers to access. For example, the stated primary purpose of the ADA Amendments Act of 2008 "is to make it <u>easier</u> for people with disabilities to obtain protection under the ADA.… The primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations and whether discrimination has occurred…" 28 C.F.R. § 36.101(b) (emphasis added). Despite Defendant's claim that a public accommodation may allow inaccessible conditions to persist until a person with a disability files suit or otherwise provokes the public accommodation to act, a close examination of the ADA's legislative history reveals Congress undoubtedly intended to place the burden on public accommodations to identify and remove discriminatory conditions.

Congress described the general intent and purposes of Title III as follows:

Title III of the ADA specifies that no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation operated by a private entity…. Existing facilities must be made accessible if the changes are "readily achievable", i.e., easily accomplishable without much difficulty or expense. Auxiliary aids and services must be provided unless such provision would fundamentally alter the nature of the program or cause an undue burden. New construction and major renovations must be designed and constructed to be readily accessible to and usable by people with disabilities.

H.R. REP. 101-485, 23-24. The DOJ's implementing regulations mirror these affirmative obligations placed on public accommodations. *See* 28 C.F.R. § 36.304 (barrier removal); § 36.305 (alternative methods); § 36.401 (accessible new constructions); § 36.402 and § 36.403 (accessible renovations). Neither the legislative history of Title III, nor any of its regulations, contains

language suggesting an individual with disabilities should be required to notify a public accommodation about discriminatory conditions before the public accommodation is required to act.

This is because "a public accommodation shall maintain" accessibility. 28 C.F.R. § 36.211(a). Section 211 does not provide that accessibility shall be maintained only when a public accommodation has been put on notice by an individual with a disability that a discriminatory condition exists. Public accommodations have been expressly put on notice of what they are required to do, including the ongoing duty to remove barriers and to thereafter maintain accessibility, by virtue of the ADA and its implementing regulations. An interpretation of Section 211 or any of the implementing regulations that would require individuals with disabilities to first complain to a public accommodation before that public accommodation is required to do anything is directly contrary to the purpose of the ADA and should be discounted.[11]

In spite of this apparent conflict with Congressional intent, the Third Circuit commented in *Mielo* that "disabled patrons like [Plaintiffs] are better served when [public accommodations] are required to spend their limited financial resources on correcting only the access violations that disabled patrons have actually brought to the [public accommodation's] attention – rather than

---

[11] The ADA prohibits what is known as "discriminatory effect". *See* 42 U.S.C. § 12182(b)(1); 28 C.F.R. § 36.204. An action may be discriminatory if it has the effect of excluding or denying participation by people with disabilities, even if the individual committing the action does not intend to discriminate. *See Helen L. v. DiDario*, 46 F.3d 325, 335 (3d Cir. 1995) (the ADA "covers not only intentional discrimination, but also the discriminatory effects of 'benign neglect, apathy, and indifference.'") (internal quotations omitted). A reading of the ADA that permits public accommodations to wait until an individual with a disability provides notice of discrimination before taking remedial action would unquestionably have the effect excluding or denying participation by people with disabilities. Indeed, one obvious effect is that even when a public accommodation has been provided notice, it may still not take any action. For example, in this matter, Defendant was provided explicit notice that many of its facilities were non-compliant by virtue of an earlier lawsuit that was filed on January 16, 2015, but after two years had elapsed, Defendant had failed to take any action to remediate the access barriers. *See* CSMF ¶¶ 23-24.

requiring those establishments to expend their limited resources". 897 F.3d at 477 n.10. The *Mielo* court's limited evaluation, however, failed to account for the fact that Congress comprehensively accounted for the competing interests of ensuring a broad elimination of discrimination and that businesses are not financially overburdened by incorporating into the ADA both the "undue burden" standard (28 C.F.R. § 36.303(a) and § 36.303(g)) and the "readily achievable" standard (42 U.S.C. § 12181(9)) when assessing whether accessibility must be provided. [12]

In promulgating the undue burden and readily achievable standards, Congress balanced the burden of accessibility mandates with considerations that include, *inter alia*: the nature and cost of the remedial action; the overall financial resources of the public accommodation; the overall size of the business; the number, type, and location of facilities at issue; the overall financial resources of any parent corporation; the type of operations of any parent company; and the effect on expenses and resources, or the impact otherwise of the remedial action on the operation of the facility. *See* 42 U.S.C. § 12181(9); 28 C.F.R. § 36.104. Congress intended these types of considerations to be weighed and applied proportionally and contextually to the public accommodation at issue relative to the remedial action needed. Thus while a small single-location convenience store may not have enough financial resources to fully implement an accessibility requirement, a large, nationwide corporation like Defendant, with posted profits of $732 million

---

[12] Indeed, Congress noted that a societal lack of accessibility is the real financial burden: "discrimination denies people with disabilities the opportunity to compete on an equal basis with others and costs the United States, State and local governments, and the private sector billions of dollars in unnecessary expenses resulting from dependency and non-productivity." H.R. REP. 101-485, 29; *see also* H.R. REP. 101-485, 36 ("[a]ccessible design does not cost more money—the human costs of inaccessible design are tremendous. Our society must open its doors to all.").

in 2017,[13] would be held to a more stringent evaluation as to whether an action is readily achievable or amounts to an undue burden.[14]

As explained above, Congress unequivocally intended for public accommodations to bear the burden of maintaining their facilities by identifying and remediating discriminatory conditions within a reasonable period. Defendant should not be permitted to avoid that obligation by pointing to hypothetical and unsubstantiated costs of compliance. The ADA may permit a place of public accommodation under some circumstances to avoid remediating a barrier to access if doing so would present an undue burden, but it does not, as Defendant claims, permit a Defendant to willfully ignore violations in the first instance.

### C.    Defendant understands its obligations under Section 211 but fails to comply.

Defendant owns and operates approximately 2,700 convenience stores and gas stations located throughout the United States. CSMF ¶¶ 1-2. As a sophisticated corporate enterprise, Defendant understands that it must maintain the accessibility of its facilities over time, and indeed, actively undertakes efforts to comply with that obligation. *Id.* ¶ 22. To ensure all of its operating

---

[13] *See* Anthony Kennedy, *Speedway grows revenue to $19B, targets new markets*, (Mar. 7, 2018) available at https://www.bizjournals.com/dayton/news/2018/03/07/speedway-grows-revenue-to-19b-targets-new-markets.html.

[14] Contrary to Defendant's mischaracterizations of Plaintiffs' Prayer for Relief (Def. Br. at 2), Plaintiffs seek run-of-the-mill ADA injunctive relief requiring Defendant to (1) remediate existing barriers as required under 28 C.F.R. § 36.304, and (2) modify its currently existing policies as required under 28 C.F.R. § 36.302 so that the discriminatory effects of those policies in permitting unchecked access barriers to persist beyond a reasonable period of time, in violation of Section 211, are eliminated. Plaintiffs also seek to monitor Defendant's actions as a means to ensure compliance, and, where necessary, to bring to the Court's attention instances of non-compliance. This type of relief is commonplace in ADA actions. *See, e.g., Heinzl v. Cracker Barrel Old Country Store, Inc.*, No. 14-cv-1455, Dkt. No. 172 (Judgment Approving Class Action Settlement) (W.D. Pa. Aug. 10, 2017). Further, although the ADA provides for the injunctive relief Plaintiffs seek (*see* 42 U.S.C. § 12188(a)(2); 28 C.F.R. § 36.501(b)), the identification of such relief was "not intend[ed]… to deprive the court of all equitable discretion". H.R. REP. 101-485, 64. As a result, the Court may frame the terms of any injunction in a manner that minimizes the burden and cost on Defendant consistent with the ADA's provisions.

stores are regularly maintained, Defendant's maintenance department employs hundreds of maintenance technicians to routinely inspect all of Defendant's facilities. *Id.* ¶¶ 3-5. These maintenance technicians specifically survey Defendant's parking facilities on a bimonthly basis, and check for whether the accessible parking spaces and access aisles are clearly painted and marked, are the correct length, and include the required signage. *Id.* ¶ 7. These maintenance efforts, however, do not account for the accessibility of parking facilities with respect to grading and sloping, and reflect the insufficiency of Defendant's maintenance practices in complying with Section 211's mandate to maintain all accessible features.

Indeed, once Defendant constructs or acquires a facility, neither the maintenance technicians, nor any of Defendant's employees, evaluate Defendant's parking facilities with respect to sloping, apart from an occasional visual inspection. *Id.* ¶ 8. Defendant does not provide maintenance technicians with any specific or formal ADA training regarding slope requirements, methods to identify non-compliant slopes, or any tools to determine if a parking facility's slopes are compliant. *Id.* ¶¶ 9, 10. And, while maintenance technicians may conduct a visual inspection of a parking facility, Defendant has acknowledged that a visual inspection alone is insufficient to identify variations in slope grades. *Id.* ¶ 12.

Defendant admits the sloping and grading of its parking facilities change over time, and that external conditions such as weather cause such changes to occur. *Id.* ¶ 11. Despite this, once Defendant constructs or acquires a facility, the slope of its parking facilities is not maintained until a major renovation or other significant external influence necessitates alteration. *Id.* ¶¶ 8, 13.

Thus, while Defendant is aware that it must maintain its facilities, and actively undertakes efforts to ensure <u>some</u> accessible features of its parking facilities are regularly reviewed and maintained, Defendant has wholly ignored its obligations to ensure <u>all</u> access features, including

16

the sloping of parking facilities, are maintained. As a result, Plaintiffs are not seeking "a vague and uncertain permanent injunction", as Defendant describes (Def. Br. at 2), but rather a modification of Defendant's currently in-effect, company-wide maintenance policies and practices to account for the maintenance of parking facility sloping. Incorporating a process to account for sloping considerations would be consistent with Defendant's self-described process of "continuous improvement" in complying with the ADA. *Id.* ¶ 16.

The record also demonstrates that Defendant is more than capable of modifying its corporate policies. For example, Defendant recently modified its centralized, company-wide policies with respect to the construction of parking facilities. *Id.* ¶ 18. Specifically, Defendant conducted an internal review of its "aging facilities" and discovered that settling occurring between concrete and asphalt of accessible parking spaces was leading to suboptimal conditions. *Id.* ¶¶ 17, 18. After performing a cost-analysis, a proposed policy change to use only concrete for accessible parking spaces was submitted to Defendant's Standards Committee, which was then adopted and implemented within a matter months. *Id.* ¶¶ 16-20.

The facts here are clear. Defendant is aware of potential barriers to access resulting from changes that occur to its parking facilities over time. Defendant's current maintenance practices cause it to inspect for various ADA violations in its parking facilities, but not slope-related violations. Defendant regularly reviews and modifies its maintenance policies and practices, and its conduct evinces its understanding of its obligation to both provide accessible facilities and to ensure they are maintained over time. Despite this, Defendant chooses to comply with Section 211 in some respects, by maintaining some accessible features, but knowingly fails to maintain slope-related features unless or until its patrons are forced to litigate. Having willfully ignored its obligations under the ADA, Defendant comes before this Court arguing that is should be permitted

17

to pick and choose which facilities and features it will maintain, while intentionally ignoring others, despite the DOJ's unequivocal mandate to maintain "all" facilities. This Court should not sanction Defendant's selective compliance with the ADA.

## II.   THE ADA PROVIDES AN EXPRESS PRIVATE RIGHT OF ACTION TO ENFORCE SECTION 211.

A private right of action is <u>expressly</u> accounted for both in the statutory provisions of the ADA as well as in its implementing regulations. Despite that fact, Defendant argues that there is no private right of action to enforce the DOJ's implementing regulations. *See* Def. Br. at 11-16. While Defendant devotes five pages of discussion to this issue, it warrants little attention.

Defendant's fundamental misunderstanding apparently stems from its failure to account for 28 C.F.R. § 36.501, which provides:

> Any person who is being subjected to discrimination on the basis of disability in violation of the Act or this part or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 303 of the Act or subpart D of this part may institute a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order.

Thus, the inquiry should end here: the ADA's implementing regulations expressly provide for a private right of action, and Defendant evidently failed to account for that fact.

Defendant further claims that "if Congress intended to authorize a private right of action to enforce Section 211, it could have done so expressly, as in the Civil Rights Act of 1964". Def. Br. at 15. But, the enforcement provision of Title III, 42 U.S.C. § 12188, incorporates by reference Title II of the Civil Rights Act ("CRA"), 42 U.S.C. § 2000a:

> "The remedies and procedures set forth in section 2000a-3(a) of this title are the remedies and procedures this subchapter provides to any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination in violation of section 12183 of this title."

*See also* H.R. REP. 101-485, 24 ("Title III incorporates enforcement provisions in private actions comparable to the applicable enforcement provisions in title II of the Civil Rights Act of 1964"). Thus, the ADA, like the CRA and other civil rights statutes, was crafted by Congress to encourage and enlist private litigants in the effort to enforce its mandates. This encouragement is reflected not only through 42 U.S.C. § 12188 but also through accompanying fee shifting provisions that allow for plaintiffs to recover attorneys' fees. *See* 42 U.S.C. § 12205; 42 U.S.C. § 2000a-3(b).

The Supreme Court has explained that fee shifting provisions are intended to encourage litigation in order to ensure that federally protected civil rights are enforced: "Congress therefore enacted the provision for counsel fees – not simply to penalize litigants… but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief under Title II." *Newman v. Piggie Park Enters., Inc.*, 309 U.S. 400, 401-02 (1968). Circuit courts have also recognized that Congress' incorporation of remedial provisions of the CRA into Title III of the ADA signals an intent to enlist private litigants in the effort to enforce Title III. *See, e.g., Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 457 (4th Cir. 2017), *quoting Newman*, 390 U.S. at 401 ("our country will be obliged 'to rely in part upon private litigation as a means of securing broad compliance.'"); *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003) (same). And finally, the Supreme Court has recognized that "[a] Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well." *Alexander v. Sandoval*, 532 U.S. 275, 284 (2001). There can be no question Congress intended the ADA to be enforced through private lawsuits – it would be counterintuitive for Congress to go to such lengths to ensure individuals can bring a private lawsuit but then to exclude private enforcement of the "authoritative interpretation" of the ADA, the DOJ's implementing regulations.

The cases Defendant cites to support its position are inapposite. *Spencer Bank, S.L.A. v. Seidman*, 309 F. App'x 546 (3d. Cir. 2008), *Wisniewski v. Rodale, Inc.*, 510 F.3d 294 (3d. Cir. 2007), and *Am. Trucking Ass'ns Inc. v. Delaware River Joint Toll Bridge Comm'n* 458 F. 3d 291 (3d. Cir. 2006), all involve questions of whether a statute itself creates a right of action. As explained above, the ADA provides an express right of action.

*Three Rivers Ctr. For Indep. Living v. Hous. Auth. Of the City of Pittsburgh* is also distinguishable because Section 211 "construe[s] a personal right that [the ADA] creates." 382 F.3d 412, 425 (3d. Cir. 2004). The ADA grants all persons with disabilities the right to "full and equal enjoyment" of the goods, services, and facilities of any public accommodation. 42 U.S.C. § 12182(a). This right does not end following the construction or renovation of a facility. If a public accommodation fails to maintain a facility's accessible features, individuals with disabilities are necessarily denied full and equal access because they will experience architectural barriers that deny them access. In contrast, violation of the regulation in *Three Rivers* would not necessarily result in denial of full and equal access in the same manner a violation of Section 211 would because the regulation at issue in *Three Rivers* required a public housing authority to construct a certain percentage of new accessible units, and there were other ways the housing authority could achieve that same goal. Here, there is no alternative method to ensure individuals' rights to full and equal access continue after a facility is constructed other than requiring a public accommodation to maintain its facilities over time.

Curiously, Defendant does not include a single example of precedent or DOJ commentary that directly establishes there is no private right of action to enforce ADA implementing regulations. Indeed, if there was no private right of action to enforce ADA implementing regulations, then undoubtedly, sometime within the past twenty-six years either Congress, the DOJ, or a court would have so held. But, the history of the ADA and countless examples of routine ADA enforcement

20

actions demonstrate that private individuals are statutorily permitted to enforce ADA implementing regulations. *See, e.g., Shariff v. Radamar Meat Corp.*, No. 11-cv-6369, 2014 WL 1311563, at *3 (E.D.N.Y. Feb. 14, 2014) (enforcement action of 28 C.F.R. §§ 36.304(b) and 402(b) concerning alteration accessibility and barrier removal in parking facilities).[15]

Defendant's failure to consider 28 C.F.R. § 36.501, its incorrect understanding of an express right of action, and its willful disregard of decades of established precedent reflecting the private enforcement of ADA implementing regulations demonstrates that Defendant's entire analysis of the nature of the private right of action under the ADA is uniformed and flawed. Accordingly, it should be rejected because Congress unequivocally, intentionally, and unambiguously created a private right of action to allow individuals to enforce the ADA and its implementing regulations.

## III.    SECTION 211 IS NOT UNCONSTITUTIONALLY VAGUE.

The ADA and many of its implementing regulations, including Section 211, were intentionally drafted to serve as a broad mandate to eliminate accessibility barriers. Taken together with the DOJ's guidance and interpretations, an owner of a public accommodation has more than fair notice of what is required by Title III and Section 211.

A void-for-vagueness analysis "must begin with a presumption in favor of the constitutionality of an act of Congress." *Parker v. Levy*, 417 U.S. 733, 757 (1974). "Because the ADA is a statute that regulates commercial conduct, it is reviewed under a less stringent standard

---

[15] *See also U.S. v. AMC Ent., Inc.*, 549 F.3d 760, 763–64 (9th Cir. 2008) (28 C.F.R. pt. 36, app. A., § 4.33.3 – concerning wheelchair seating in assembly areas); *Brooke v. A-Ventures, LLC*, No. 2:17-cv-2868, 2017 WL 5624941, at *1 (D. Ariz. Nov. 22, 2017) (28 C.F.R. § 36.302(e)(1)(i) – concerning website accessibility); *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 282 (2d Cir. 2009) (28 C.F.R. § 36.303(c) – concerning the provision of auxiliary aids and services); *Santiago Ortiz v. Caparra Ctr. Associates, LLC*, 261 F. Supp. 3d 240, 247 (D.P.R. 2016) (28 C.F.R. § 36.302 – concerning the modification of policies for service animals).

of specificity." *Botosan v. Paul McNally Realty*, 216 F.3d 827, 836 (9th Cir. 2000) *citing Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (holding an "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action."). "The fundamental rationale underlying the vagueness doctrine is that due process requires a statute to give adequate notice of its scope." *See Grayned v. City of Rockford,* 408 U.S. 104, 108 (1972). A statute is not vague when it sets forth "an imprecise but comprehensible normative standard" but instead when "no standard of conduct is specified at all." *Coates v. City of Cincinnati,* 402 U.S. 611, 614 (1971). Under this standard, Section 211 is vague only if it is so indefinite that it fails to articulate a comprehensible standard to which a public accommodation's conduct must conform.

In support of its argument that Section 211 is unconstitutionally vague, Defendant complains "the DOJ provides no explicit guidelines, such as a list of features that must be maintained, the frequency with which such maintenance must be performed, and what level of maintenance is considered 'feasible.'" Def. Br. at 17. However the DOJ has provided extensive guidelines in the form of the U.S. Department of Justice, 2010 ADA Standards For Accessible Design (September 15, 2010), technical guidance materials, manuals, and handbooks that describe in detail the exacting standards that govern the design and construction of facilities, as well as specific guidance on barrier removal, in order to maintain the accessibility of facilities.   Indeed, the DOJ has published technical assistance materials specifically addressing maintenance, "Maintaining Accessible Features in Retail Establishments", and a "maintenance list" for accessible parking is included. While not an exhaustive list, the DOJ has made clear that maintaining accessible parking and related accessible features is encompassed within the scope of

22

Section 211. Apart from these materials, however, the DOJ has explained in no uncertain terms that Section 211 "broadly covers all features that are required to be accessible under the ADA". 73 Fed. Reg. 34508-01, 34523. Defendant's claim of a lack of guidance as to what features should be maintained under Section 211 is not only wrong but sorely uninformed.

As to frequency, the maintenance obligation must be considered in relation to a public accommodation's continuing obligation to remove access barriers. *See* ADA Title III Technical Assistance Manual Covering Public Accommodations and Commercial Facilities, III-4.400 ("Technical Assistance Manual")[16] ("The obligation to engage in readily achievable barrier removal is a continuing one."). The frequency with which barrier removal must occur and subsequent efforts to maintain such accessibility is contingent on the nature of the public accommodation at issue – which is precisely why Section 211 was drafted as a general mandate. *See, e.g.,* 73 Fed. Reg. 34508-01, § 36.211 (describing Section 211 as a "general rule"). Comporting with this general applicability, the DOJ has advised that "allowing obstructions… to persist **beyond a reasonable period of time** would violate [Section 211]", 28 C.F.R. § Pt. 36, App. C, and that Section 211 "would be violated, if repairs are not made promptly", Technical Assistance Manual, III-3.7000. Thus Defendant has been provided sufficient notice that it must ensure accessibility is maintained such that any lapse of accessibility is repaired "promptly" so that it does not persist "beyond a reasonable period of time".

With respect to "feasibility", the Standards establish in detail the degree of accessibility that must be achieved for any given accessible feature, and the readily achievable and undue burden standards set forth a broad and comprehensive framework to evaluate whether implementing such accessibility is feasible. The readily achievable and undue burden standards,

---

[16] Available at https://www.ada.gov/taman3.html (lasted accessed December 14, 2018).

coupled with the exhaustive specifications, examples, and commentary the DOJ has provided to explain the types of accessibility a public accommodation must provide to be ADA compliant cannot be described in good faith as "no explicit guideline".

Given the above, while Defendant is correct that Section 211 does not indicate a public accommodation must adopt policies to "seek out and anticipatorily remedy future, hypothetical ADA violations", it does adequately provide notice to a public accommodation that it must maintain <u>all</u> accessible features and promptly repair any lapse of accessibility within a reasonable period of time. Section 211 does not mandate <u>how</u> accessible features must be maintained, but instead requires <u>that</u> they be maintained. To the extent a public accommodation fails to address accessibility features that have fallen out of compliance, including slope requirements for parking lots, the DOJ has specifically advised that Section 211 "would be violated… if improper or inadequate maintenance causes repeated and persistent failures." Technical Assistance Manual, III-3.7000. It can hardly be said that the statutory language of Section 211 combined with the DOJ's unambiguous guidance "fails to provide a person of ordinary intelligence fair notice of what is prohibited". *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

<u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendant's Motion for Partial Summary Judgment.

Dated:  December 14, 2018                      Respectfully Submitted,

                                               */s/ Edwin J. Kilpela*
                                               Edwin J. Kilpela
                                               ekilpela@carlsonlynch.com
                                               Benjamin J. Sweet
                                               bsweet@carlsonlynch.com
                                               **Carlson Lynch Sweet**
                                               **Kilpela & Carpenter LLP**
                                               1133 Penn Avenue, 5th Floor
                                               Pittsburgh, Pennsylvania 15221
                                               Tel.: (412) 322-9243
                                               Fax: (412) 231-0246

                                               *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 14, 2018, a true and correct copy of the foregoing PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT was served upon all counsel of record via the Court's electronic filing system.

*/s/ Edwin J. Kilpela*